UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RONALD KEVIN STORN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MORGAN STANLEY,<br><br>Defendant. | No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Ronald Kevin Storn ("Plaintiff"), by and through his undersigned attorneys, brings this class action on behalf of himself individually and all others similarly situated, against Defendant Morgan Stanley (the "Company," or "Defendant").

Plaintiff brings claims for negligence per se, violations of the LIBOR Act, breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief. The allegations below are based upon personal knowledge as to Plaintiff and his own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation of counsel, which included, among other things, (i) a review and analysis of U.S. Securities and Exchange Commission ("SEC") filings by Morgan Stanley, (ii) a review and analysis of press releases and other public statements, and (iii) a review and analysis of reports, including media reports, about the Company.

## I.      SUMMARY OF THE ACTION

1.      This is a class action for damages and/or restitution, as well as injunctive relief, brought against Morgan Stanley on behalf of a class consisting of all persons and entities who own or owned shares of Morgan Stanley's Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series E ("Series E Shares"); Fixed-to-Floating Rate Non-Cumulative Preferred Stock,

Series F ("Series F Shares"); and Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series I ("Series I Shares," collectively with the Series E Shares and Series F Shares, the "Preferred Shares") at any time between April 28, 2023 and the conclusion of this action (the "Class").

2. Defendant Morgan Stanley is a multinational investment bank and financial services company, headquartered at 1585 Broadway, New York, New York 10036. Morgan Stanley was recently ranked 40th in the Fortune 500, which ranks U.S. corporations by total revenue.

3. As offered in 2011, Morgan Stanley's Series E Shares called for an October 15, 2023, transition from a fixed-rate dividend to a floating-rate dividend pegged to the three-month London Interbank Offered Rate ("LIBOR").

4. As offered in 2013, Morgan Stanley's Series F Shares called for a January 15, 2024, transition from a fixed-rate dividend to a floating-rate dividend pegged to the three-month LIBOR.

5. As offered in 2014, Morgan Stanley's Series I Shares called for an October 15, 2024, transition from a fixed-rate dividend to a floating-rate dividend pegged to the three-month LIBOR.

6. LIBOR was a key benchmark interest rate between major global banks, published daily by the Intercontinental Exchange.[1]  For decades, LIBOR was used as a benchmark[2] for

---

[1] *See* Julia Kagan, *Understanding LIBOR: Its Role and Replacement*, Investopedia (April 2, 2026), https://www.investopedia.com/terms/l/libor.asp.

[2] "Benchmark" rates set global interest levels for various transactions and have traditionally been used in finance to calculate floating interest rates for numerous financial instruments worldwide and are typically "calculated by an independent body, most often to reflect the cost of borrowing money in different markets." *See* Bloomberg, *Finance, Overview—Benchmark Rates*, *https://www.bloomberglaw.com/external/document/X2M5PMDO000000/finance-overview-benchmark-rates* (last visited June 12, 2024); European Central Bank, *What are benchmark rates, why are they important and why are they being reformed?* (July 11, 2019),

setting interest rates on debt instruments such as mortgages, corporate loans, and credit cards, as well as for financial products such as derivatives and preferred stock.  As of the end of 2020, the value of financial products referencing U.S. Dollar ("USD") LIBOR was $223 *trillion*.[3]

7.    It was standard industry practice to peg interest rates on loans sold in the United States to LIBOR denominated in U.S. Dollars.  However, by 2012, banks were accused by various regulatory agencies of manipulating LIBOR rates.

8.    In 2014, as a response to concerns about the reliability and robustness of LIBOR and other term wholesale unsecured bank borrowing rates, the United States Department of the Treasury Financial Stability Oversight Council called for the development of alternative interest rate benchmarks.  Later that year, the Board of Governors of the Federal Reserve System and the Federal Reserve Bank of New York created the *Alternative Reference Rates Committee* ("ARRC") to help ensure a successful transition from USD LIBOR to a more robust reference rate—its recommended alternative, the Secured Overnight Financing Rate ("SOFR").

9.     By late 2017, as a result of price manipulation, the LIBOR panel banks announced that they would stop publishing LIBOR at the end of 2021 (later extended to June 2023 for USD LIBOR only) to enable time for the market to move away from LIBOR.

10.    In 2018, the ARRC was reconstituted with expanded membership to, among other things, coordinate with the cash and derivatives markets on the risk that LIBOR might not exist

---

https://www.ecb.europa.eu/ecb-and-you/explainers/tell-me-more/html/benchmark_rates_qa.en.html
#:~:text=Interest%20rate%20benchmarks%20%E2%80%93%20also%20known,other%20more%20complex%20financial%20transactions.

[3] Board of Governors of the Federal Reserve System, *Final Regulation Implementing the Adjustable Interest Rate (LIBOR) Act*, at 2 n.3 (Dec. 2, 2022), https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20221216a2.pdf.

beyond 2021.  Additionally, it aimed to develop guiding principles for transitioning various financial products, including floating rate products, from LIBOR to SOFR.

11.    Thomas Wipf was ***Chair of the ARRC and Managing Director at Defendant Morgan Stanley***.  He expressly recognized the concern of floating rate securities improperly being transitioned into fixed rate securities upon LIBOR's cessation:

> ***For many existing legacy contracts that reference LIBOR, however, things are much less simple … effectively converting what were floating-rate instruments into fixed-rate instruments.***[4]

12.    By 2019, the ARRC published guidance on suggested fallback provisions to reduce market disruption in the event of LIBOR's cessation.  This included recommendations for fallback provisions on floating rate notes, bilateral business loans, syndicated loans, securitizations, and residential adjustable-rate mortgages.  The ARRC considered international standards from the International Swaps and Derivatives Association ("ISDA").

13.    Among the aims of the ARRC's published guiding principles were to encourage robust fallback provisions to replace LIBOR with SOFR or a SOFR-like equivalent, minimize ambiguity, and reduce litigation and regulatory risk.  The ARRC sought to ensure that LIBOR fallback language resembled language used in other classes and liabilities where feasible; to ensure that LIBOR fallback language was feasible, practicable, and fair; and to encourage the use of fallback provisions that did not advantage any market participant to the disadvantage of another.  Since their release, the ARRC's fallback language recommendations have been subject to numerous public consultations and have received widespread adoption by a multitude of market participants.

---

[4] *The LIBOR Transition: Protecting Consumers and Investors*, 117th Cong. 357, at 114 (Nov. 2, 2021) ("Senate Hrg.") (statement of Thomas Wipf, Chair of the Alternative Reference Rates Committee and Managing Director, Morgan Stanley) (emphasis added).

4

14.    In 2022, because a significant number of financial contracts in the United States referenced LIBOR and contained no procedure for replacing LIBOR in the event of its cessation, Congress adopted the Adjustable Interest Rate (LIBOR) Act (the "LIBOR Act"), 12 U.S.C. § 5801 *et seq*.

15.    Specifically, § 5801, detailing Congress's "findings and purpose" of the LIBOR Act, states:

> (a) Findings
> Congress finds that—
>
> [¶]
>
> > (2) a significant number of existing contracts that reference LIBOR ***do not provide for the use of a clearly defined or practicable replacement benchmark rate when LIBOR is discontinued***; and
> >
> > (3) the cessation … of LIBOR could result in disruptive litigation related to existing contracts that do not provide for the use of a clearly defined or practicable replacement benchmark rate.
>
> (b) Purpose
> It is the purpose of this chapter—
>
> > (1) to establish a clear and uniform process, on a nationwide basis, for replacing LIBOR in existing contracts the terms of which do not provide for the use of a clearly defined or practicable replacement benchmark rate …;
> >
> > (2) to preclude litigation related to existing contracts the terms of which do not provide for the use of a clearly defined or practicable replacement benchmark rate ….

12  U.S.C. § 5801 (emphasis added).

16.    Nowhere in the hundreds of pages of historical legislative records underlying the LIBOR Act does anyone suggest that a fixed rate qualifies as a benchmark replacement or adequate fallback provision. The legislative record demonstrates the opposite—stating that a goal

is to prevent floating-rate instruments from unfairly converting into fixed-rate instruments—like the use of a temporary waterfall fallback provision here to convert the floating rate note into a fixed rate one. ***Defendant's own Thomas Wipf, as Chair of the ARRC***, noted, "For many existing legacy contracts that reference LIBOR, however, things are much less simple … ***effectively converting what were floating-rate instruments into fixed-rate instruments***."[5] Congress sought to "establish a clear and uniform framework on a nationwide basis for replacing LIBOR in legacy contracts … [, which] should be targeted narrowly to address legacy contracts that have no fallback language, that have fallback language referring to LIBOR or to a poll of banks, ***or that effectively convert to fixed-rate instruments***."[6]

17.    The LIBOR Act mandates that for certain securities contracts that reference or use a LIBOR-based rate after June 30, 2023, including those governing the Preferred Shares at issue here, financial institutions must replace LIBOR with the Federal Reserve Bank's benchmark created in 2017 as an alternative to LIBOR: SOFR.  In December 2022, pursuant to authority granted to it under the LIBOR Act, the Board of Governors of the Federal Reserve System issued a final rule (the "LIBOR Rule") adopting SOFR as a replacement for LIBOR.  *See* Regulations Implementing the Adjustable Interest Rate (LIBOR) Act (Regulation ZZ), 12 C.F.R. § 253.4(b) (2023).

18.    Section 5803 of the LIBOR Act states that once LIBOR ceases to exist on June 30, 2023, the "Board-selected benchmark replacement *shall* be the benchmark replacement for any LIBOR contract that … contains no fallback provisions; or contains fallback provisions that

---

[5] Senate Hrg. 114 (statement of Thomas Wipf, Chair of the Alternative Reference Rates Committee and Managing Director, Morgan Stanley) (emphasis added).

[6] House Hrg. 63 (statement of Mark Van Der Weide, General Counsel of the Federal Reserve) (emphasis added).

identify neither—(A) a specific benchmark replacement; nor (B) a determining person" (emphasis added).  *See also* 12 C.F.R. § 253.3(a).

19.    The Prospectus Supplements for Morgan Stanley's Preferred Shares contain no fallback provisions accounting for the permanent cessation of LIBOR.  There is no specific benchmark replacement, nor a designated "determining person."  As such, the LIBOR Act and LIBOR Rule *required* and require Morgan Stanley to use SOFR to calculate the floating rates for the Preferred Shares.

20.    On April 28, 2023, instead of complying with the law and adopting a floating rate pegged to the three-month SOFR (LIBOR's replacement), Morgan Stanley shocked investors by announcing that it would continue paying the lower *existing fixed rate* in perpetuity on each of the Preferred Shares.[7]

21.    Morgan Stanley has no legal basis for doing so, and its decision contravenes the most basic underlying nature of this security—that its variable floating rate be pegged to a "clearly defined" and "practicable" market rate.[8]

22.    Had Morgan Stanley complied with the LIBOR Act and LIBOR Rule and adopted the three-month SOFR, as many of its competitors had done, the holders of the Preferred Shares would be paid a floating rate appreciably higher than the illegally, improperly, and unfairly adopted fixed rates.

---

[7] *See Replacement Rate For U.S. Law-Governed U.S. Dollar LIBOR-Linked Preferred Stock (and Related Depositary Shares), Debt Securities and Certificates of Deposits*, https://www.morganstanley.com/press-releases/replacement-rate-for-u-s--law-governed-u-s--dollar-libor-linked-.

[8] *See* 12 U.S.C. § 5801(b)(1); 12 C.F.R. § 253.1(c); *see also* ARRC, *Second Report—The Alternative Reference Rate Committee*, at 25, 27 (Mar. 2018), https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2018/ARRC-Second-report (also noting that most contracts referencing LIBOR do not appear to have envisioned a permanent or indefinite cessation of LIBOR and have fallbacks that would not be economically appropriate if this event occurred).

23. For example, the holders of Series E Shares would have received 9.64% on January 15, 2024—not the 7.125% fixed rate that Morgan Stanley announced.

24. Morgan Stanley's Preferred Shares are, on information and belief, held by investors who have and will continue to suffer losses in amounts that will be proven at trial.

## II. JURISDICTION AND VENUE

25. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) of the Class Action Fairness Act ("CAFA") because the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and the proposed Class includes more than one hundred (100) Class members, with at least one member of the proposed Class being a citizen of a different state than at least one Defendant.

26. This Court has personal jurisdiction over Defendant because Defendant is headquartered and has its principal place of business in the state of New York.

27. Venue is appropriate in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391 for the following reasons: (i) Defendants are subject to personal jurisdiction in this judicial district; (ii) the injury to Plaintiff occurred within this judicial district; and (iii) many of the acts and transactions giving rise to this action occurred in this judicial district.

## III. PARTIES

28. Plaintiff Ronald Kevin Storn ("Plaintiff" or "Storn") is a natural person and a resident of Kentucky. He holds 1,436 depositary shares of Morgan Stanley's Series E Shares, and 3,535 depositary shares of Morgan Stanley's Series F Shares. As a result of Defendant's conduct alleged herein, Storn has incurred injuries and will continue to incur additional injuries.

8

29.    Defendant Morgan Stanley is a multinational investment bank and financial services company with a principal place of business at 1585 Broadway, New York, New York 10036.

## IV.    FACTUAL ALLEGATIONS

### A.    Morgan Stanley Issues Fixed-to-Floating Rate Preferred Shares

#### i.    The Series E Preferred Shares

30.    In 2011, Morgan Stanley issued 30,000,000 depositary shares each representing 1/1000th ownership interest in a share of perpetual Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series E ("Series E"), with the option for underwriters to purchase up to 4,500,000 additional depositary shares. The sale of Series E Preferred Shares was expected to raise approximately $862,500,000. These Series E Preferred Shares trade on the New York Stock Exchange (NYSE) under the ticker symbol MS/PE.

31.    The operative contract for Series E consists of (i) the Certificate of Designation, (ii) the Prospectus Supplement, and (iii) the Base Prospectus, to the extent it is incorporated by reference in the Prospectus Supplement.

32.    Dividends on Series E Shares were to be paid quarterly at a rate of 7.125% per annum of the liquidation preference of $25 per depositary share ($25,000 per share).

33.    As offered in 2011, the Prospectus Supplement for Series E called for the instrument to transition on October 15, 2023, from that fixed-rate to a floating-rate dividend pegged to the 3-month LIBOR.

34.    Then, from and including October 15, 2023, and thereafter (the "Floating Rate Period" for Series E), Series E Preferred Shareholders were and will continue to be entitled to receive cumulative dividends on their Preferred Shares at a floating rate equal to three-month

LIBOR, as calculated on each applicable dividend determination date, plus 4.32% per annum based on the $25.00 per depositary share liquidation preference. Dividends are payable quarterly in arrears on January 15, April 15, July 15, and October 15.

35.    Series E shares rank senior to the common shares with respect to payments of dividends or amounts upon liquidation, dissolution, or winding up, and were not redeemable before October 15, 2023. On or after October 15, 2023, Morgan Stanley may redeem any or all of the Series E shares at $25.00 per depositary share. The Series E Preferred Shares have no stated maturity date.

### ii.    The Series F Preferred Shares

36.    In 2013, Morgan Stanley issued 34,000,000 depositary shares each representing 1/1000th ownership interest in a share of perpetual Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series F ("Series F"), with the option for underwriters to purchase up to 5,100,000 additional depositary shares. The sale of Series F Preferred Shares was expected to raise approximately $977,500,000. These Series F Preferred Shares trade on the NYSE under the ticker symbol MS/PF.

37.    The operative contract for Series F consists of (i) the Certificate of Designation, (ii) the Prospectus Supplement, and (iii) the Base Prospectus, to the extent it is incorporated by reference in the Prospectus Supplement.

38.    Dividends were to be paid quarterly at a rate of 6.875% per annum of the liquidation preference of $25 per depositary share ($25,000 per share).

39.    As offered in 2013, the Prospectus Supplement for Series F called for the instrument to transition on January 15, 2024, from a fixed-rate to a floating-rate dividend pegged to the 3-month LIBOR.

40.    Then, from and including January 15, 2024, and thereafter (the "Floating Rate Period" for Series F), Series F Preferred Shareholders were and will continue to be entitled to receive cumulative dividends on their Preferred Shares at a floating rate equal to three-month LIBOR, as calculated on each applicable dividend determination date, plus 3.94% per annum based on the $25.00 per depositary share liquidation preference. Dividends are payable quarterly in arrears on January 15, April 15, July 15, and October 15.

41.    Series F shares rank senior to the common shares with respect to payments of dividends or amounts upon liquidation, dissolution, or winding up, and were not redeemable before January 15, 2024. On or after January 15, 2024, Morgan Stanley may redeem any or all the Series F shares at $25.00 per depositary share. The Series F Preferred Shares have no stated maturity date.

### iii.    The Series I Preferred Shares

42.    In 2014, Morgan Stanley issued 40,000,000 depositary shares each representing 1/1000th ownership interest in a share of perpetual Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series I ("Series I"), with the option for underwriters to purchase up to 6,000,000 additional depositary shares. The sale of Series I Preferred Shares was expected to raise approximately $1,150,000,000. These Series I Preferred Shares trade on the NYSE under the ticker symbol MS/PI.

43.    The operative contract for Series I consists of (i) the Certificate of Designation, (ii) the Prospectus Supplement, and (iii) the Base Prospectus, to the extent it is incorporated by reference in the Prospectus Supplement.

44.    Dividends were to be paid quarterly at a rate of 6.375% per annum of the liquidation preference of $25 per depositary share ($25,000 per share).

11

45.     As offered in 2013, the Prospectus Supplement for Series I called for the instrument to transition on October 15, 2024, from a fixed-rate to a floating-rate dividend pegged to the 3-month LIBOR.

46.     Then, from and including October 15, 2024, and thereafter (the "Floating Rate Period" for Series I), Series I Preferred Shareholders were and will continue to be entitled to receive cumulative dividends on their Preferred Shares at a floating rate equal to three-month LIBOR, as calculated on each applicable dividend determination date, plus 3.708% per annum based on the $25.00 per depositary share liquidation preference. Dividends are payable quarterly in arrears on January 15, April 15, July 15, and October 15.

47.     Series I Preferred Shares rank senior to the common shares with respect to payments of dividends or amounts upon liquidation, dissolution, or winding up, and were not redeemable before October 15, 2024. On or after October 15, 2024, Morgan Stanley may redeem any or all the Series I Preferred Shares at $25.00 per depositary share. The Series I Preferred Shares have no stated maturity date.

**B.      SOFR is Created as an Alternative to LIBOR**

48.     For decades, it was standard industry practice to peg interest rates on loans sold in the United States to LIBOR denominated in U.S. Dollars.  LIBOR was a basic rate of interest used in lending between banks on the London interbank market and served as a reference for setting the interest rate on loans and instruments such as preferred stock.  However, by 2012, banks were accused by various governmental agencies of manipulating LIBOR rates.

49.     In 2014, in anticipation of the potential cessation of the LIBOR benchmark while the rate was still integrated into and used in contracts and financial instruments, the Board of Governors of the Federal Reserve System and the Federal Reserve Bank of New York created the

ARRC, which developed an alternative to LIBOR: SOFR.  SOFR has been published on an overnight basis since 2018 and is a broad measure of the cost of borrowing cash overnight, collateralized by Treasury securities in the overnight Treasury repurchase agreement market.

50.     In 2018, the ARRC developed a set of guiding principles for transitioning various financial products, including floating rate products, from LIBOR to SOFR.  By 2019, in an effort to reduce future market disruption, the ARRC published guidance on suggested fallback provisions to be included within contracts and financial instruments that used LIBOR as a benchmark for use in the event of LIBOR's permanent cessation.  Among the aims of the ARRC's published guiding principles were ***to encourage robust fallback provisions that replaced LIBOR with SOFR or a SOFR equivalent; minimize ambiguity; reduce litigation and regulatory risk; ensure LIBOR fallback language resembled language used in other classes and liabilities where feasible; ensure that fallback language was feasible, practicable, and fair; and encourage the use of fallback provisions that did not advantage any market participant to the disadvantage of another***.  All of the ARRC's suggested benchmark replacements for LIBOR contemplated using either SOFR with certain tenor spread adjustments, or replacements chosen by a relevant governmental body or the ISDA.  For its part, the ISDA has also published guidance encouraging the replacement of LIBOR in floating rate contracts with SOFR.[9]

51.     While one of the ARRC's guiding principles on benchmark replacements allowed for issuers to choose their own replacement rate, this guidance stipulated that the default replacement rate chosen by the appropriate governmental body must include a "spread adjustment," which could be positive, negative, or zero, to accommodate variances from the then

---

[9] *See* 12 C.F.R. § 253, App. A.

current benchmark rate.   None of ARRC's suggested guiding principles on benchmark replacements endorse the use of an existing fixed rate as a replacement to LIBOR.

52.    Similar to LIBOR, SOFR publishes one-, three-, six- and twelve-month forward-looking rates and is considered by experts to be the more accurate and secure interest rate pricing benchmark.

53.    Since their release, the ARRC's fallback language recommendations have been subject to numerous public consultations and have received widespread adoption by a multitude of market participants.   Indeed, the ARRC's findings are specifically cited by the Board of Governors of the Federal Reserve in the Board's final memorandum implementing the LIBOR Act, as well as part of the Supplementary Information published as part of the LIBOR Rule.[10]

54.    Morgan Stanley's Preferred Shares contracts *do not contain* a fallback provision for calculating dividend rates during the floating rate period *in the event that LIBOR ceases to exist*.[11]

55.    For example, the Prospectus Supplement for Series E provides for a floating rate that is pegged to LIBOR:

> Holders of the Series E Preferred Stock shall be entitled to receive, when, as and if declared by our Board of Directors or a duly authorized committee of the Board, out of funds legally available for the payment of dividends under Delaware law, non-cumulative case dividends from the initial issue date … commencing on January 15, 2014. These dividends will accrue on the liquidation preference amount … at a rate per annum equal to 7.125% with respect to each dividend period from and including the original issue date to, but excluding, October 15, 2023 (the "fixed

---

[10] Board of Governors of the Federal Reserve System, *Final Regulation Implementing the Adjustable Interest Rate (LIBOR) Act*, at 2 n.3, *supra* note 3; Regulations Implementing the Adjustable Interest Rate (LIBOR) Act, 88 Fed. Reg. 5204-01, 5205 n.15 (Jan. 26, 2023).

[11] Prospectus Supplement Series E at S-15, Prospectus Supplement Series F at S-15, Prospectus Supplement Series I at S-15.

rate period") and at a rate per annum equal to the three-month U.S. dollar LIBOR (as described below) on the related dividend determination date plus 4.32% ….[12]

56.     However, the Prospectus Supplement only addresses what to do when LIBOR is *temporarily* unavailable; it neither anticipates nor provides a remedy for LIBOR's permanent cessation:

> (i) ***LIBOR will be the rate*** for deposits in U.S. dollars for a period of three months, commencing on the first day of such dividend period, ***that appears on Reuters screen page "LIBOR01"***, or any successor page, at approximately 11:00 a.m., London time, on that dividend determination date.

> (ii) ***If no such rate appears***, then the calculation agent will [take certain actions] …. ***If the banks so selected by the calculation agent are not quoting as set forth above, LIBOR for that dividend determination date will be*** the same as LIBOR for the immediately preceding dividend period, ***or, if there was no such dividend period, the dividend payable will be based on the initial dividend rate***.[13]

**C.     Congress Adopts the LIBOR Act and the Federal Reserve Issues the LIBOR Rule**

57.     In March 2021, the United Kingdom Financial Conduct Authority announced that LIBOR would cease publication and set forth a plan for transition.  Banks and financial institutions stopped using USD LIBOR for new loans in the United States by January 1, 2022, and all remaining USD LIBOR rate publications were discontinued by June 30, 2023.

58.     Recognizing the need for a uniform, nationwide solution for replacing references to USD LIBOR in legacy contracts and concerned about ensuing turmoil, Congress and the Federal Reserve sought to pass legislation to address the U.S. market's heavy reliance on the LIBOR benchmark.

---

[12] Prospectus Supplement Series E, at S-14.

[13] Prospectus Supplement Series E, at S-15 (emphasis added). The Prospectus Supplements for Series F and Series I contain identical language.

59.    The Federal Reserve explained: "Of particular concern are so-called 'tough legacy contracts,' which are contracts that reference USD LIBOR and will not mature by June 30, 2023, but which lack adequate fallback provisions providing for a ***clearly defined or practicable replacement benchmark*** following the cessation of USD LIBOR." *See* Regulations Implement the Adjustable Interest Rate (LIBOR) Act, 88 Fed. Reg. 5204-01, 5205 (Jan. 26, 2023) (codified at 12 C.F.R. pt. 253) (emphasis added).  Congress, therefore, set out to address contracts (like the Prospectus Supplement here) that did not "contemplate the permanent cessation of LIBOR."[14] According to the Federal Reserve, "many floating-rate notes and securitizations have problematic fallback language—generally, these contracts convert to fixed-rate instruments at the last published value of LIBOR."[15] Indeed, ***Thomas Wipf, Chair of the ARRC and Managing Director at  Morgan Stanley***, noted, "For many existing legacy contracts that reference LIBOR, however, things are much less simple … ***effectively converting what were floating-rate instruments into fixed-rate instruments***."[16]  As Senator Patrick Toomey stated during hearings, "any legislation that addresses tough legacy contracts must be narrowly tailored, not change the equities of these contracts …."[17]

60.    To avoid chaos and litigation stemming from such concerns, Congress sought to pass legislation that "establish a clear and uniform framework on a nationwide basis for replacing

---

[14] *The End of LIBOR: Transitioning to an Alt. Interest Rate Calc. for Mortgs., Student Loans, Bus. Borrowing, and Other Fin. Prods.: Hrg. Before H. Comm. on Fin. Servs.*, 117th Cong. 17, at 14 (Apr. 15, 2021) ("House Hrg.") (statement of Daniel E. Coates, Senior Associate Director, Office of Risk Analysis and Modeling, Federal Housing Finance Agency).

[15] House Hrg. 62 (statement of Mark Van Der Weide, General Counsel, Bd. of Govs. Fed. Reserve).

[16] Senate Hrg. 114 (statement of Thomas Wipf, Chair of the Alternative Reference Rates Committee and Managing Director, Morgan Stanley) (emphasis added).

[17] Senate Hrg. 135.

LIBOR in legacy contracts … [, which] should be targeted narrowly to address legacy contracts that have no fallback language, that have fallback language referring to LIBOR or to a poll of banks, *or that effectively convert to fixed-rate instruments*."[18]

61.     To this end, on March 15, 2022, Congress enacted the LIBOR Act.  Moreover, pursuant to authority granted to it under the LIBOR Act, the Federal Reserve issued the LIBOR Rule in December 2022 adopting SOFR as the default replacement for LIBOR.  *See* 12 C.F.R. § 253.4(b).

62.     The LIBOR Act broadly defines "LIBOR contract" to include any obligation or asset that, by its terms, uses the overnight, one-month, three-month, six-month, or twelve-month tenors of USD LIBOR as a benchmark.  Broadly, for LIBOR-based contracts (a) without fallback provisions for its discontinuation of LIBOR or (b) with LIBOR-based fallback provisions, it requires that SOFR be substituted for LIBOR.

63.     Congress intended for counter-parties to be skeptical of actions like that here where Morgan Stanley is attempting to force indefinite fixed rate on its LIBOR-based floating rate instrument.  In Section 5803(c) of the LIBOR Act, Congress provided a safe harbor from liability only for those that adopted the Board-selected benchmark replacement: SOFR:

> No person shall be subject to any claim or cause of action in law or equity or request for equitable relief, or have liability for damages, arising out of—
>
> (1) the selection or use of a Board-selected benchmark replacement; [and]
>
> (2) the implementation of benchmark replacement conforming changes ….

12. U.S.C. § 5803(c).

---

[18] House Hrg. 63 (statement of Mark Van Der Weide, General Counsel of the Federal Reserve) (emphasis added).

17

64.     The LIBOR Act and LIBOR Rule were adopted to address the exact deficiencies present in Morgan Stanley's outdated legacy Prospectus Supplement, which has no clearly defined, practicable replacement benchmark rate or fallback procedures for replacing LIBOR in the event of its discontinuation.

**D.      Morgan Stanley Acts in Contravention of the LIBOR Act and LIBOR Rule**

65.     By 2023, banks, real estate investment trusts, and financial institutions that had previously issued loans or preferred stock pegged to LIBOR began transitioning to SOFR.  For example, Bank of America—which had issued LIBOR-based variable rate investments governed by legacy fallback provisions similar to those used by Morgan Stanley, *i.e.*, contemplating a fixed rate replacement only if LIBOR was temporarily available and only after obtaining quotes from banks—announced a replacement of the three-month LIBOR rate with the three-month SOFR rate as adjusted pursuant to the LIBOR Act and the Federal Reserve's LIBOR Rule on comparable floating-rate preferred shares.

66.     Holders of Morgan Stanley's Preferred Shares were entitled to the same treatment. Specifically, as of October 15, 2023, Morgan Stanley should have paid Series E Preferred Shareholders a floating rate dividend equal to three-month SOFR plus certain tenor spread adjustments set forth in the LIBOR Rule plus a spread of 4.32% per annum based on the twenty-five dollars ($25.00) per share liquidation preference.  As of January 15, 2024, Morgan Stanley should have paid Series F Preferred Shareholders a floating rate dividend equal to three-month SOFR plus certain tenor spread adjustments set forth in the LIBOR Rule plus a spread of 3.94% per annum based on the twenty-five dollars ($25.00) per share liquidation preference.  And as of October 15, 2024, Morgan Stanley should have paid Series I Preferred Shareholders a floating rate dividend equal to three-month SOFR plus certain tenor spread adjustments set forth in the

LIBOR Rule plus a spread of 3.708% per annum based on the twenty-five dollars ($25.00) per share liquidation preference.

67. On April 28, 2023, Morgan Stanley announced that instead of adopting the three-month SOFR rate, it had unilaterally decided to replace its floating Three-Month LIBOR interest rate obligation for certain of its Preferred Shares (including Series E, F, and I) with the existing fixed rate, stating:

> Morgan Stanley (NYSE: MS) announced today that, ***except for the instruments identified below***, the U.S. law-governed U.S. dollar LIBOR-linked preferred stock (and related depositary shares) and debt securities issued by Morgan Stanley and Morgan Stanley Finance LLC, and certificates of deposit issued by Morgan Stanley Bank, N.A., will transition from using U.S. dollar LIBOR as a benchmark to the CME Term SOFR Reference Rate published for the tenor corresponding to the relevant U.S. dollar LIBOR rate plus a tenor spread adjustment (the "Replacement Rate") (i) by operation of law, pursuant to the Adjustable Interest Rate (LIBOR) Act, or (ii) pursuant to the terms of such instruments. The replacement of U.S. dollar LIBOR with the Replacement Rate will be effective for determinations that are made after June 30, 2023 (the "Cessation Date"), when the relevant U.S. dollar LIBOR settings are expected to either cease publication or no longer be representative but will not affect any determinations made on or prior to the Cessation Date.
>
> [¶]
>
> ***The following chart identifies the U.S. law-governed U.S. dollar LIBOR-linked preferred stock*** (and related depositary shares) and debt securities issued by Morgan Stanley that will not transition to the Replacement Rate by operation of law or otherwise. ***After the Cessation Date, dividends or interest on these instruments will continue to accrue at the specified fixed rate.***

| CUSIP | Description |
|-------|-------------|
| 61762V200 | Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series E (and related depositary shares) (7.125%) |
| 61763E207 | Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series F (and related depositary shares) (6.875%) |
| 61761J406 | Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series I (and related depositary shares) (6.375%)[19] |

68.     In doing so, Morgan Stanley relied upon a legacy LIBOR-based fallback provision used in similar form throughout the industry that was clearly created to be used in the event of *a temporary delay in the reporting of LIBOR rates*, where "LIBOR [would] be the rate … that appears on Reuters screen page 'LIBOR101'".[20]  Pursuant to that provision, if such temporary delay in the reporting of LIBOR were to occur, Morgan Stanley first would try to obtain quotes from London banks and, if no suitable quotes could be obtained, Morgan Stanley would be required to obtain quotes from three New York banks.  If, and only if, no suitable quotes could be obtained from New York banks, Morgan Stanley would revert to the LIBOR dividend rate paid in the previous period. If there was no such dividend period using LIBOR, the dividend rate for the period in question would be based on the initial dividend rate. Thus, upon cessation of LIBOR's publication, Morgan Stanley continued to permanently rely upon and follow the

---

[19] Morgan Stanley, *Replacement Rate for U.S. Law-Governed U.S. Dollar LIBOR-Linked Preferred Stock (and Related Depositary Shares), Debt Securities and Certificates of Deposit* (April 28, 2023) (https://www.morganstanley.com/press-releases/replacement-rate-for-u-s--law-governed-u-s--dollar-libor-linked-) (emphasis added).

[20] Prospectus Supplement Series E, at S-15.

20

provision designed for the temporary unavailability of a LIBOR rate to pay in perpetuity the already-existing fixed rate instead of the required floating rate.

69.    Morgan Stanley misconstrues the LIBOR Act and LIBOR Rule, as well as its own Prospectus Supplement, disadvantaging its preferred stockholders and undermining the LIBOR Act's core objective—to protect all parties to LIBOR contracts from being unfairly disadvantaged by LIBOR's permanent cessation.

70.    First, the Prospectus Supplements are "tough legacy contracts" that did not contemplate the permanent cessation of LIBOR, reflecting the type of contract that requires adoption of the SOFR index under the LIBOR Act and Rule. The waterfall provisions in the Prospectus Supplements accounting for LIBOR's *temporary* unavailability are not "clearly defined," "practicable," or "workable"[21] fallback provisions, but rather are temporary fixes for when LIBOR is unavailable on a particular date and time. Morgan Stanley's obligation to pay a floating rate and the lack of an alternative benchmark in the Prospectus Supplements demonstrate that the parties (and the Prospectus Supplements) did not anticipate the permanent cessation of LIBOR. Indeed, the floating-rate provisions in the Prospectus Supplements require Morgan Stanley to pay a premium over LIBOR—a clear and separate indication that neither party contemplated using a fixed rate as a replacement for LIBOR in perpetuity.

71.    The legislative history for the LIBOR Act is filled with references to the very type of temporary LIBOR replacement provisions that Morgan Stanley seemingly relies on here is selecting a fixed rate— referring only to LIBOR and not contemplating LIBOR's demise. For example, as Mr. Coates explained, many contracts simply "did not contemplate the permanent

---

[21] Board of Governors of the Federal Reserve System, *Final Regulation Implementing the Adjustable Interest Rate (LIBOR) Act*, at 2 (Dec. 2, 2022).

cessation of LIBOR[,]" for an orderly transition away from LIBOR.[22]  Similarly, Mark Van Der Weide, General Counsel for the Federal Reserve and the person identified as being responsible for the drafting of the LIBOR Act, affirmed that the LIBOR Act was designed to address such permanent cessation scenarios not contemplated by contracts.[23] The Securities Industry and Financial Markets Association (SIFMA) testified that tough legacy contracts "executed prior to LIBOR cessation and in many cases prior to the development/adoption of robust fallback language (e.g., 2019-2020) … were not designed at the time of issuance with a permanent cessation, of LIBOR in mind."[24]

72.    In adopting the fixed rates as LIBOR replacements for the Preferred Shares, Morgan Stanley violated the LIBOR Act and LIBOR Rule when it attempted to rely on that inapplicable language in the Prospectus Supplement.

### E.    Preferred Shareholders' Present and Future Harm

73.    Preferred Shareholders have and will continue to earn less than the interest promised on their investment, in an amount potentially exceeding $325 million in damages and/or losses, in addition to any available pre- and post-judgement interest.

74.    From and including October 15, 2023 and thereafter, Series E Preferred Shareholders were and will continue to be entitled to receive cumulative dividends on their Preferred Shares at a floating rate equal to three-month SOFR with a tenor spread adjustment, as

---

[22] House Hrg. at 14.

[23] House Hrg. at 62-63.

[24] House Hrg. at 95, 97.

calculated on each applicable dividend determination date, plus a spread of 4.32% per annum based on the $25.00 per depositary share liquidation preference.

75.    From and including January 15, 2024 and thereafter, Series F Preferred Shareholders were and will continue to be entitled to receive cumulative dividends on their Preferred Shares at a floating rate equal to three-month SOFR with a tenor spread adjustment, as calculated on each applicable dividend determination date, plus a spread of 3.94% per annum based on the $25.00 per depositary share liquidation preference.

76.    From and including October 15, 2024 and thereafter, Series I Preferred Shareholders were and will continue to be entitled to receive cumulative dividends on their Preferred Shares at a floating rate equal to three-month SOFR with a tenor spread adjustment, as calculated on each applicable dividend determination date, plus a spread of 3.708 % per annum based on the $25.00 per depositary share liquidation preference.

## V.    CLASS ACTION ALLEGATIONS

77.    Plaintiff brings this action as a class action individually and on behalf of all others similarly situated pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities who own or owned shares of Morgan Stanley's Series E, F, or I Preferred Shares at any time between April 28, 2023 and the conclusion of this action.  Excluded from the Class are (a) Defendant; (b) the subsidiaries and affiliates of Defendant; (c) any person who is an officer, director, or controlling person of Defendant; (d) any entity in which any person or entity excluded from the Class has a controlling interest; (e) Defendant's directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (f) the legal representatives, heirs, successors, or assigns of any such excluded party.

78.     The members of the Class are so numerous and geographically dispersed throughout the country that joinder of all members is impracticable.  While the exact number and location of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class located nationwide. Indeed, as of June 30, 2025, Morgan Stanley had 34,500, 34,000, and 40,000 outstanding shares (or 34,500,000, 34,000,000, and 40,000,000 outstanding depositary shares) of Series E, F, and I Preferred Shares, respectively.

79.     Members of the Class may be identified from records maintained by Morgan Stanley, its transfer agent, or other brokers and nominees and, as necessary, may be notified of the pendency of this action by mail, using a form of notice customarily used in class action lawsuits.

80.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class, including:

(a)     whether Defendant was required to comply with the LIBOR Act as set forth in 12 U.S.C. § 5801 *et seq.*;

(b)     whether Defendant's conduct as alleged herein violated the Adjustable Interest Rate (LIBOR) Act, 12 U.S.C. § 5801 *et seq.*;

(c)     whether Defendant was required to comply with the LIBOR Rule as set forth in 12 C.F.R. § 253 *et seq.*;

(d)     whether Defendant's conduct as alleged herein violated the LIBOR Rule, 12 C.F.R. § 253 *et seq.*;

(e)     whether Defendant's violation of the LIBOR Act entitles the Class to relief;

24

(f)    whether Defendant's violation of the LIBOR Act amounts to a breach of contract; and

(g)    whether Plaintiff and the putative Class members are entitled to relief, including restitution and injunctive relief, as sought herein.

81.    Plaintiff's claims are typical of the claims of other members of the Class and the other members of the Class suffered economic injury and will continue to suffer economic injury as a result of Defendants' wrongful conduct in violation of state law as alleged in this Complaint.

82.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions.  Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

83.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the money and/or property lost by the individual Class members as well as the future harm to them may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress those wrongs.  There will be no difficulty in the management of this action as a class action.

84.    Further, the Class should be certified pursuant to Federal Rule of Civil Procedure 23(b)(2) because:

(a)    The prosecution of separate actions by the individual members of the proposed Class would create a risk of inconsistent adjudications, which could establish incompatible standards of conduct for Morgan Stanley;

25

(b)     The prosecution of individual actions could result in adjudications that, as a practical matter, would be dispositive of the interests of non-party Class members or that would substantially impair their ability to protect their interests; and

(c)     Morgan Stanley has acted or refused to act on grounds generally applicable to the proposed Class, thereby making final injunctive and other equitable relief appropriate with respect to the members of the proposed Class as a whole.

## VI.     CAUSES OF ACTION

### COUNT ONE

### Negligence *Per Se*

85.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

86.     Pursuant to the LIBOR Act, Defendant had an obligation to adopt a floating rate pegged to SOFR upon the redemption dates of its Series E, F, and I Preferred Shares because Defendant did not have a valid fallback provision identifying a benchmark replacement in the event of the permanent cessation of LIBOR.

87.     Plaintiff and Class Members are within the class of investors that the LIBOR Act was intended to protect.

88.     The harm that resulted from Defendant's decision to convert its Series E, F, and I Preferred Shares to a fixed rate instead of adopting floating-rate SOFR is the type of harm the LIBOR Act was intended to guard against.

89.     Defendant breached its obligations to Plaintiff and Class members under the LIBOR Act by failing to comply with the LIBOR Act's requirement that rates pegged to LIBOR must now peg to SOFR absent a valid fallback provision.

26

90.    Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se*.

91.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class members, Plaintiff and Class members would not have been injured.

92.    The injury and harm suffered by Plaintiff and Class members were the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that its failure to adopt SOFR was a breach of its obligations under the LIBOR Act and LIBOR Rule, and that Defendant's breach would case Plaintiff and Class Members to experience the foreseeable harms associated with the decision to continue paying a lower fixed rate on the Series E, F, and I Preferred Shares instead of the agreed-to floating rate.

93.    As a direct and proximate result of Defendant's negligent conduct, Plaintiff and Class members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

## COUNT TWO

### Violation of the LIBOR Act, 12 U.S.C. § 5801 *et seq.*, and LIBOR Rule, 12 C.F.R. § 253

94.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

95.    Pursuant to Section 5803 of the LIBOR Act and LIBOR Rule, Defendant was required to replace LIBOR with SOFR, the Federal Reserve Bank's benchmark replacement rate, in securities contracts referencing LIBOR-based rates, unless the contracts contained a fallback provision identifying a specific benchmark replacement in the event of the permanent cessation of LIBOR. Defendant's Prospectus Supplements for its Series E, F, and I Preferred Shares contain no such benchmark replacements.

96.     Instead of complying with its obligations under the LIBOR Act and LIBOR Rule, Defendant unilaterally announced it would maintain the fixed-rate dividends for its Series E, F, and I Preferred Shares while transitioning other instruments to a rate pegged to SOFR after the cessation of LIBOR.

97.     Defendant has and continues to violate the LIBOR Act and LIBOR Rule, as set forth above. Defendant has unlawfully caused Plaintiff and Class members to receive less in dividends on their interest in Series E, F, and I Preferred Shares than they would have if Defendant not violated the LIBOR Act and LIBOR Rule.

98.     As a result of the foregoing, Plaintiff and Class members incurred harm.

## COUNT THREE

### Breach of Contract and Breach of the
### Covenant of Good Faith and Fair Dealing

99.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

100.    The operative contracts between Defendant Morgan Stanley and Plaintiff and the Class for Series E, F, and I Fixed-to-Floating Rate Non-Cumulative Preferred Shares consists of each series' (i) Certificate of Designation, (ii) Prospectus Supplement, and (iii) Base Prospectus, to the extent incorporated by reference in the Prospectus Supplement.

101.    Plaintiff and Class members have performed all obligations required under the contract, including purchasing and holding the Series E, F, and I Preferred Shares.

102.    Parties to a contract are required not only to adhere to the express conditions in the contract, but also to act in good faith when they are invested with a discretionary power over the other party. In such circumstances, the party with discretion is required to exercise that power and discretion in good faith. This creates an implied promise to act in accordance with the parties'

reasonable expectations. Morgan Stanley is prohibited from exercising its discretion to defeat Plaintiff's reasonable expectations.

103. The operative contracts between Plaintiff and Defendant sets out the terms for the payment of dividends to owners of Series E, F, and I Preferred Shares. According to the Series E Prospectus Supplement, as of October 15, 2023, dividends on the Series E Preferred Shares were to begin to be paid based on a floating rate pegged to the three-month LIBOR. According to the Series F Prospectus Supplement, as of January 15, 2024, dividends on the Series F Preferred Shares were to begin to be paid based on a floating rate pegged to the three-month LIBOR. According to the Series I Prospectus Supplement, as of October 15, 2024, dividends on the Series I Preferred Shares were to begin to be paid based on a floating rate pegged to the three-month LIBOR.

104. The LIBOR Act and LIBOR Rule required that, after LIBOR's cessation on June 30, 2023, all legacy contracts pegging to LIBOR should instead peg to SOFR (with limited, inapplicable exceptions).

105. When Defendant announced on April 28, 2023 that instead of providing for its Series E, F, and I Preferred Share the contractually-agreed-upon floating rates pegged to LIBOR (which was SOFR, as required by the LIBOR Act and LIBOR Rule), it would maintain the initial fixed rates for those Preferred Shares, it breached its contract with those Preferred Shareholders.

106. Defendant Morgan Stanley unilaterally decided that the Series E, F, and I Preferred Shares would not transition to a floating-rate on the dates they were contractually set to transition but, instead, would remain at a fixed rate. Morgan Stanley abused its discretionary power to defeat the reasonable expectations of Plaintiff and the Class members that their Preferred Shares would transition to a floating dividend rate.

107.    As a direct and proximate result of Defendant's breaches of its contractual obligations, Plaintiff and Class members have suffered damages including, but not limited to, lost dividend income and diminution in the value of their Preferred Shares.

## COUNT FOUR

### Breach of the Implied Covenant of Good Faith and Fair Dealing, In the Alternative

108.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

109.    The terms of the operative contracts between Defendant Morgan Stanley and Plaintiff and the Class for Series E, F, and I Fixed-to-Floating Rate Non-Cumulative Preferred Shares (consisting of each series' (i) Certificate of Designation, (ii) Prospectus Supplement, and (iii) Base Prospectus, to the extent incorporated by reference in the Prospectus Supplement) were at all times herein valid and enforceable contractual obligations of Morgan Stanley to Plaintiff and Class members.

110.    New York law implies in every contract a covenant requiring each party to deal fairly and in good faith with the other and to refrain from taking any actions that would deprive the other party of the benefit of their respective bargain.

111.    Morgan Stanley breached the implied covenant of good faith and fair dealing by engaging in a course of conduct outside of performance of the contract by failing to transition the Series E, F, and I Preferred Shares to a floating-rate dividend pegged to SOFR during their respective Floating Rate Period and instead maintaining the previous fixed-rate dividends.

112.    Morgan Stanley's course of conduct violated the implied covenant of good faith and fair dealing because it defeated the reasonable expectations of Plaintiff and Class members that dividends on their shares would transition to a floating-rate (and one pegged to LIBOR and,

30

later, SOFR); it violated federal law; and it was arbitrary, unreasonable, and frustrated the purpose of the contract by depriving Plaintiff and Class members of the benefit of their bargain-namely, the transition to a floating dividend rate after the fixed-rate period.

113.    As a direct and proximate result of Defendant's breaches of its duty of good faith and fair dealing, Plaintiff and Class members have suffered damages, including but not limited to lost dividend income and diminution in the value of their Preferred Shares.

## COUNT FIVE

### Declaratory Relief, 28 U.S.C. § 2201(a)

114.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

115.    28 U.S.C. § 2201(a) provides:

> [A]ny court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of an interested party seeking such a declaration, whether or not further relief is or could be sought.

116.    Pursuant to 28 U.S. § 2201(a), Plaintiff is entitled to a declaration that Defendant is in violation of the LIBOR Act, 12 U.S.C. 5801 *et seq.*, and the LIBOR Rule, 12 C.F.R. § 253 *et seq.*, for failing to provide a floating rate dividend equal to three-month SOFR plus certain tenor spread adjustments set forth in the LIBOR Rule and instead implementing a fixed rate with respect to the Series E, F, and I Preferred Shares.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)    Determining that this action is a proper class action, certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiff's counsel as Class Counsel;

31

(b)    Declaring that Defendant must implement the applicable Board-selected benchmark replacement, SOFR plus a tenor spread, as a replacement to the three-month LIBOR rate set forth in the Prospectus Supplements for Morgan Stanley's Series E, Series F, and Series I Preferred Shares pursuant to the LIBOR Rule, 12 C.F.R. § 253.5 *et seq.*;

(c)    Granting injunctive relief as permitted by law and in equity;

(d)    Ordering that Defendant pay all amounts owed to the Plaintiff and the Class arising out of the actions complained of herein, including compensatory damages, restitution, interest, disgorgement of any ill-gotten gains, and any other relief as allowed in law or equity;

(e)    Awarding Plaintiff and the Class their reasonable fees and expenses incurred in this action, including counsel fees and expert fees;

(f)    Awarding pre- and post-judgment interest, as allowed in law or equity; and

(g)    Awarding such other and further relief as the Court may deem just and proper.

## VIII.    DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury.

DATED:  April 27, 2026                    Respectfully submitted,

                                          By:      /s/ *Sean M. Akchin*
                                                   Sean M. Akchin (N.Y. Bar # 5629118)

                                          **BERMAN TABACCO**

                                          Nicole Lavallee (*PHV forthcoming*)
                                          Daniel E. Barenbaum (*PHV forthcoming*)
                                          425 California Street, Suite 2300
                                          San Francisco, CA 94104
                                          Tel: (415) 433-3200
                                          nlavallee@bermantabacco.com
                                          dbarenbaum@bermantabacco.com
                                          sakchin@bermantabacco.com

                                          *Counsel for Plaintiff Ronald Kevin Storn*
                                          *and the Putative Class*